THE SANITARY DISTRICT OF CHICAGO, Appellant, *vs.* THE METROPOLITAN WEST SIDE ELEVATED RAILWAY COMPANY *et al.* Appellees.

*Opinion filed October 26, 1909.*

1. APPEALS AND ERRORS—*when a freehold is involved.* A proceeding for a mandatory injunction to compel the removal, from premises claimed in fee by the complainant, of a bridge abutment which the defendant claims the right to maintain by virtue of a perpetual easement in the land, involves a freehold, and a direct appeal lies to the Supreme Court.

2. RES JUDICATA—*one not a party to condemnation suit is not bound by judgment.* Where a sanitary district, after beginning suit to condemn a strip of land, acquires a portion of such strip by purchase from the city with knowledge that a part of the purchased land is in possession of an elevated railroad company which is not made a party to the condemnation suit, the condemnation judgment, finding the title to the purchased land to be in the petitioner, is not binding upon the railroad company and does not deprive it of any rights in the land it may have acquired from the petitioner's grantor, the city.

3. MUNICIPAL CORPORATIONS—*when consent of a city to use of its land must be presumed.* Where the ordinance granting to an elevated railroad company the right to construct its railroad along a specified route and to build a new bridge across a river between certain streets provides that the work shall be done upon such plans and in such manner as shall be approved by the commissioners of public works, the building of an abutment for the bridge upon land acquired by the city with a view to excavating it to widen the river must be presumed to have been done with the consent of the city.

4. SAME—*affirmative act by city is not essential to create an estoppel.* While the right of the public in lands held in trust for it by a city cannot be lost by mere non-user, yet it is not essential that there be some affirmative act by the city upon which to base an estoppel, but the estoppel may arise out of long acquiescence, coupled with such conduct and acts by the city as amount to a ratification.

5. SAME—*when doctrine of equitable estoppel applies.* Where a city, with full knowledge of the facts and with the approval of its commissioner of public works, permits an elevated railroad company to expend a substantial sum of money in building a bridge abutment upon the city's land and makes no objection for many years to the railroad company's use of the completed bridge, the doctrine of equitable estoppel applies, and neither the city nor its grantee with notice can compel the railroad company to remove the abutment and surrender possession of the land.

6. PRACTICE—*correct practice where appeal should have been taken to Appellate Court.* If an appeal is taken to the Supreme Court which should have been taken to the Appellate Court, the Supreme Court, under the present statute, will not dismiss the appeal on motion but will transfer the cause to the Appellate Court.

APPEAL from the Circuit Court of Cook county; the Hon. JULIAN W. MACK, Judge, presiding.

The appellant, the Sanitary District of Chicago, filed its original bill of complaint in this cause in the circuit court of Cook county on the 7th day of August, 1908. The Metropolitan West Side Elevated Railway Company, the Aurora, Elgin and Chicago Railroad Company and the city of Chicago were made defendants. The two last named defendants filed general demurrers to the bill and the Met-

ropolitan Railway Company filed a general and special demurrer. On February 26, 1909, appellant filed an amendment to its bill of complaint, and it was ordered by the court that the demurrers of the several defendants to the original bill stand to the amended bill. The demurrers of all the defendants were sustained by the court, and the appellant electing to stand by its bill of complaint as amended, said bill was dismissed by the court, and the appellant has prosecuted this appeal.

It is alleged in the amended bill that appellant is a municipal corporation organized and existing under the act of May 29, 1889, creating sanitary districts; that by said act it is granted power to provide for carrying off the drainage of said sanitary district by establishing and maintaining one or more channels, drains, ditches and outlets for that purpose; that it could acquire, by purchase, condemnation or otherwise, any and all real estate and personal property and right of way privilege, either within or without its corporate limits, that may be required for its corporate purposes, and that it is authorized to enter upon, widen, deepen and improve any navigable or other water-way, canal or lake. It is further alleged that in order to carry out the purposes for which it was organized and make effective the main channel by it constructed, it was necessary for it to widen and deepen the Chicago river, and also for the purpose of complying with the statute of the State of Illinois and obtaining as a minimum flow through its channel three hundred thousand cubic feet of water per minute; that the board of trustees of the complainant on May 20, 1903, passed an ordinance, by the terms of which the said board laid out and established a right of way for the deepening and widening of the said Chicago river between the south line of Madison street and the north line of VanBuren street, in the city of Chicago, and in order to make said improvements it was necessary to excavate certain premises hereafter described. It is further alleged that

complainant constructed a channel from Robey street, in the city of Chicago, to the city of Joliet, Illinois; that the Secretary of War gave permission to complainant to connect its said channel with the west fork of the south branch of the Chicago river, and that pursuant to said permission said connection was made, and since the 17th of January, 1900, the waters of the said Chicago river have flowed into said main channel and from thence into the DesPlaines and Illinois rivers.

It is further alleged that on the 9th of December, 1885, the Pittsburg, Fort Wayne and Chicago Railway Company, being the owner of certain land in Chicago, Cook county, Illinois, abutting upon the west side of the south branch of the Chicago river, by an instrument of that date duly executed, granted, bargained and sold to the city of Chicago a certain part of said premises described in said instrument; that said instrument was duly recorded in the recorder's office of Cook county, Illinois, on March 11, 1886. This instrument is set out in full in the bill, and recites, in substance, that whereas the first party, the Pittsburg, Fort Wayne and Chicago Railway Company, a corporation of the State of Illinois, is possessed of certain real estate in the city of Chicago, county of Cook and State of Illinois, abutting upon the west side of the south branch of the Chicago river; and whereas the second party, the city of Chicago, desires to secure from the first party a certain portion of said lands for the purpose of straightening the south branch of the Chicago river between Adams street and VanBuren street; and whereas, also, second party is about to construct a swing bridge over the said south branch of the Chicago river at Adams street where the same crosses said south branch, and desires to obtain from first party the right to construct, operate, maintain and swing said bridge over certain land possessed by said first party abutting upon said south branch upon the west side thereof and lying on either side of Adams street where the same crosses the said

241—40

south branch; therefore the first party, in consideration of the payments and covenants stipulated to be paid and performed by the second party, grants, bargains and sells to the second party certain land abutting on the west side of the south branch of the Chicago river lying on either side of Jackson street, the portion of said land on the south side of said Jackson street thus conveyed being 8311 square feet, more or less, and the portion on the north side of said Jackson street being 1742 square feet, more or less. Said conveyance is made for the purpose and object that the land may be excavated, and that the south branch of the Chicago river between Adams and VanBuren streets may be straightened to this extent. The first party retains the right to land vessels at the dock to be constructed by said first party after said excavation shall have been made, for the purpose of loading and unloading, but such use shall not interfere with the operation of said Adams street bridge or with the rights of second party in and to Jackson street, or with the free use of the river for the purposes of navigation. The first party grants to second party the right to erect and forever maintain, operate and swing a bridge at Adams street, on the west side of the south branch of the Chicago river where Adams street crosses said river. It is recited that as the land mentioned had been leased from the Pennsylvania Railroad Company, the consent, in writing, of this company to the agreement should be obtained as a condition precedent to the validity of the agreement. This consent was obtained and is set out and made a part of the agreement. The second party agrees, in consideration of the grants aforesaid, to pay to the said Pennsylvania Railroad Company, or to such person or corporation as may be designated, in writing, by such company, the interest on the sum of $30,000, at the rate of four per cent per annum, provided the second party may at any time pay the whole of said principal sum of $30,000, or any part thereof. Upon the payment of said entire prin-

cipal sum all further payments by said second party shall
cease and all rights granted by this agreement shall vest in
said second party in perpetuity, but the riparian rights or
easements retained by first party shall not be impaired. The
right given to party of the second part to make the entire
payment of the $30,000 shall be exercised within twenty
years from the date of the agreement. The instrument is
dated December 9, 1885.

It is further alleged in the bill that another contract was
made between the city of Chicago and the Pittsburg, Fort
Wayne and Chicago Railway Company on June 28, 1889,
which was duly recorded, and provided that said city should
have the right to construct and operate a full-arm instead
of a half-arm bridge at Adams street, and that in accord-
ance with said contracts said city of Chicago did construct
swing bridges at Adams street and at Jackson street, which
were and are connected with Canal street by viaducts, which
extend over and across certain railroad tracks and buildings.

It is further alleged that on the 7th of April, 1892, the
city council of the city of Chicago passed an ordinance,
which was duly accepted by the Metropolitan West Side
Elevated Railroad Company, granting to such company
permission and authority to construct, maintain and oper-
ate an elevated railroad and branches. A copy of the ordi-
nance is made a part of the bill and is set out in full. By
section 1 of the ordinance permission and authority are
granted to the Metropolitan West Side Elevated Railroad
Company to construct, maintain and operate, for a period
of fifty years from and after the passage of the ordinance,
an elevated railroad, with branches, etc., along and upon
certain routes in the city of Chicago, which are, in part,
as follows: First, for the main line of said railroad, com-
mencing on or near to the east line of Fifth avenue, in the
city of Chicago, at some point between the south line of
Jackson street on the north and the north line of West
Congress street (as it exists at the west line of Halsted

street if produced, east to Fifth avenue,) on the south, and running thence between said Jackson street on the north and the said line of Congress street so produced on the south, over, along, upon and across such lots, lands and property as the company now owns or hereafter may acquire, by lease, purchase, condemnation or otherwise, to the south branch of the Chicago river; thence across said river by means of a bridge, as hereinafter provided. Fourth, the said company may cross the Chicago river, as provided in section 1, either by means of a new bridge hereby authorized to be constructed by it, upon such plans and in such manner as shall be approved by the commissioner of public works, or, at its option, by means of the existing bridge now erected at VanBuren street at the said place of crossing, and for that purpose the said company may, at its own expense, re-build and enlarge the said existing bridge upon such plan and in such manner as shall be approved by the mayor and commissioner of public works, but the same, as so re-built and enlarged, shall not, nor shall such new bridge hereby authorized, be so constructed as to unnecessarily obstruct navigation or drainage.

The bill further alleges that after the passage of the ordinance aforesaid, the Metropolitan West Side Elevated Railroad Company entered into an agreement with the Pennsylvania Railroad Company and the Pittsburg, Fort Wayne and Chicago Railway Company, dated April 16, 1894, in and by which agreement said last mentioned companies purported and attempted to grant and convey to the Metropolitan West Side Elevated Railroad Company the right to construct and maintain its elevated railroad structure over and upon the premises described in said contract of December 9, 1885, but that said attempted grant and conveyance as to said premises were subject to the rights of the city of Chicago, and to the extent that said conveyance was in conflict with the rights of the said city the same was null and void and of no effect.

It is further alleged that on the 9th day of February, 1898, the complainant and the Pennsylvania Company (operating the Pittsburg, Fort Wayne and Chicago Railway Company) entered into an agreement, whereby there was granted by the Pennsylvania Company to the complainant the right to construct a by-pass over and across a portion of said premises. Article 2 of this agreement provides that the sanitary district shall construct the by-pass at its own expense and shall pay any damage resulting from the by-pass to the railway company; that the sanitary district shall cover the by-pass and pay an annual rental of $3000. By the fifth section it is provided that whenever the sanitary district shall determine that the use and maintenance of said by-pass is not necessary, then it shall have the right to terminate the contract upon giving six months' notice of its election to do so and that all liability shall then cease, and it is alleged that this notice was given and accepted on October 23, 1905, and that thereafter all rights of the respective parties to said contract ceased and determined.

The bill alleges that on the 21st day of April, 1899, the complainant entered into an agreement with said Metropolitan West Side Elevated Railroad Company, whereby the complainant agreed to make certain alterations in the water tunnel of said company. This agreement recites, among other things, that the sanitary district is engaged in improving the Chicago river to supply the amount of water required by law; that the river cannot be deepened on account of the tunnel of the railway company; that the company requires large amounts of water in its production of electricity; that this water is supplied by means of a tunnel which extends across the right of way and yards of the Pennsylvania railroad to the river at a point immediately north of the Metropolitan bridge abutment; that the sanitary district proposes to construct the by-pass west of the abutment of the Metropolitan bridge under its agreement with the railroad company of February 9, 1898, and that

the construction of the by-pass will destroy one hundred and four feet of the tunnel; that the district desires to protect the company in the full beneficial use of said tunnel and desires to construct a new intake on the west side of the by-pass, so that the company may have the same use of said tunnel that it would have had had said by-pass not been constructed. The company consents that the district may construct a by-pass in accordance with said agreement of February 9, 1898, and the sanitary district agrees to maintain the water supply of the tunnel during the construction of the by-pass and to pay damages for each hour the supply is cut off; to keep the by-pass clean, to the end that the company may have the same supply of water that it would have if the tunnel and intake had remained in the original position, and if it shall discontinue or be deprived of the use of said by-pass for any reason it shall at once reconstruct that part of said tunnel above described, and in default of so doing for a period of sixty days shall pay the sum of $50 per day to said company or its successors for each one thousand horse-power then employed by said company or its successors. The district agrees not to damage the bridge or railroad of the company during the construction of the by-pass. It is alleged that on May 26, 1899, an agreement was entered into between the Pennsylvania Company, as party of the first part, the Metropolitan West Side Elevated Railroad Company, as party of the second part, and complainant, as party of the third part, relating to the taking up and reconstruction by the complainant of a certain intake and tunnel belonging to the said Metropolitan Railroad Company, as provided in the agreement between complainant and said company dated April 21, 1899, and that in accordance with both of said agreements the complainant constructed said by-pass, and that it also, at its own expense, removed and reconstructed the intake and water tunnel above mentioned.

The bill alleges that prior to October 1, 1903, the complainant had purchased numerous tracts of land adjacent to said south branch and caused the same to be excavated for the purpose of widening and deepening said stream, and was desirous of securing the right to excavate the premises conveyed to the city of Chicago by the said Pittsburg, Fort Wayne and Chicago Railway Company by said instrument of December 9, 1885, and in order to secure said right represented to the mayor of the city of Chicago that it would pay to said city the sum due from said city to said railway company under the terms of said instrument, and that thereupon, on October 5, 1903, the mayor submitted to the city council of said city a message, wherein he set forth the terms of the agreement of December 9, 1885, between the city and the railway company, and stated that the city had paid the rental therein provided for up to the 30th day of June, 1898; that the project which the city of Chicago undertook of widening and straightening the river had been taken up by the trustees of the Sanitary District of Chicago; that said trustees had offered to furnish the city the amount of money due for the payment of the purchase price and interest which had accrued, said money to be used by the city for the payment to the railway company of the amounts due under said instrument. Pursuant to the message of the mayor the city council of Chicago, on October 5, 1903, adopted a resolution, which recites the provisions of the contract of December 9, 1885, above referred to and set forth; that whereas the Sanitary District of Chicago is engaged in widening and deepening the south branch of the Chicago river, and the said land so purchased by the said city of Chicago by the said contract of December 9, 1885, being necessary for the use of the said sanitary district in so widening and improving the south branch of the Chicago river; and whereas the sanitary district offers to pay to the city of Chicago the amount of money necessary to complete and perfect the title of the city of

Chicago in said real estate so purchased by it, being the sum of $30,000 purchase money and $7000 rental, therefore it is resolved that the comptroller of the said city of Chicago is authorized to receive from said sanitary district the sum of $37,000 for the purposes aforesaid, and upon receipt of said money the comptroller is ordered to pay it over as directed by the terms of said contract, and if for any reason a larger sum is required, the comptroller is authorized to receive and pay it out on the same conditions.

It is further alleged that on the 6th day of October, 1903, for the purpose of acquiring the right to excavate said property, the trustees of the sanitary district adopted a resolution, which is set forth in the bill, and which also recites the terms and provisions of the contract of December 9, 1885, between the city and the railway company, and in substance the same facts as contained in the ordinance of October 5, 1903, adopted by the city of Chicago. The resolution then authorizes and directs the president and clerk of the sanitary district to deposit with the comptroller of the city of Chicago the sum of $40,000, or such part thereof as is necessary to be used by said comptroller for the purposes aforesaid, and in order to facilitate the work of the district in acquiring the property aforesaid for the purposes of widening the south branch of the Chicago river. It is alleged that said sum of $40,000 was so paid to the city of Chicago pursuant to said resolution and that the sum of $3000 was returned by it to the district, as it was found that the sum of $37,000 was the amount due under the contract; and that on May 20, 1903, the trustees of the sanitary district passed an ordinance laying out and establishing its right of way for deepening and widening the south branch of the Chicago river between the south line of Madison street and the north line of VanBuren street, in said city, and that the premises described in the contract of December 9, 1885, were included in said ordinance.

The bill further alleges that on May 26, 1903, the complainant filed its petition for condemnation in the circuit

court of Cook county, Illinois, making the Pittsburg, Fort
Wayne and Chicago Railway Company, the Pennsylvania
Company and the city of Chicago defendants; that the real
estate described in said contract of December 9, 1885, was
included in said petition; that thereafter, and preliminary
to the empaneling of the jury in said condemnation pro-
ceedings, a trial was had upon the question of title and tes-
timony was heard and evidence offered, and thereupon the
court, on October 21, 1903, entered a judgment, finding,
among other things, that the lands described in said instru-
ment of December 9, 1885, belonged to the complainant, to
be used by it for the uses and purposes described in said
petition; that after the entry of said order of October 21,
1903, a jury was empaneled in said cause and a trial had
to determine the just compensation to be awarded for cer-
tain premises described in said petition but not described or
included in said contract of December 9, 1885, and that a
verdict and judgment were rendered in said cause award-
ing to certain respondents the sum of $1,389,940; that the
complainant perfected an appeal from said judgment to the
Supreme Court of the State of Illinois, and that court af-
firmed the judgment of the circuit court. *Sanitary District
of Chicago* v. *Pittsburg, Ft. Wayne and Chicago Railway
Co.* 216 Ill. 575.

It is further alleged in the bill that by reason of the
foregoing facts and the judgments of the circuit court of
Cook county and the Supreme Court of Illinois complain-
ant became and is the owner of said premises described in
said contract of December 9, 1885, and is entitled to ex-
ercise all rights in and to said premises acquired by said
city of Chicago under the agreement of December 9, 1885;
that the rights of complainant are superior to the alleged
rights of the Metropolitan West Side Elevated Railway
Company or of the other defendants to the bill; that on
June 1, 1894, the Metropolitan West Side Elevated Rail-
road Company wrongfully and unlawfully entered on said

land in said instrument of December 9, 1885, described, excavated a large hole in said land and placed therein a certain abutment or foundation for its bridge extending over and across said south branch, and completed said bridge on or about May 1, 1895; that said company never had any title to or easement in the premises, or any part thereof, or any grant, license or permission from complainant or the city of Chicago. It is alleged that all the right, title and interest of said Metropolitan West Side Elevated Railroad Company in and to the said abutment and bridge and other property of said company were duly transferred and assigned to the Metropolitan West Side Elevated Railway Company, and that said last named company now owns said property and operates said railway, and has unlawfully and wrongfully, from time to time, entered upon said premises in said instrument of December 9, 1885, described, laid and maintained wires and railroad tracks and repaired the said abutment and bridge, and that said company never had any right or easement in said premises.

The bill alleges that that part of the south branch of the Chicago river situated immediately easterly of the property described in the agreement of December 9, 1885, is extremely narrow; that the by-pass above mentioned was constructed for the purpose of causing a part of the waters of said river to flow through the same; that the waters of said river have flowed, and still do flow, through said by-pass; that it would cost approximately $2000 to extend the said tunnel of the Metropolitan West Side Elevated Railway Company described in the agreement of April 21, 1889, from its present terminus at the westerly wall of the said by-pass to the cut-off line hereinafter mentioned, and that when so extended the waters of the river will continue to flow into said tunnel, and the complainant avers that it is ready and willing, and offers and agrees, to extend said tunnel in any form or manner the court shall direct or decree.

It is further alleged that the south branch of the Chicago river varies in width from one hundred and forty to two hundred feet, excepting that part adjacent to the premises described in the agreement of December 9, 1885; that the plans of complainant for widening said river require a uniform width of two hundred feet, excepting between bridge abutments; that most of the property required for widening said river to said width has been secured, and numerous new bridges have been constructed across said south branch by complainant at a cost of over $7,000,000; that in order to widen said south branch on the east side thereof opposite the premises in question it would be necessary to remove many valuable brick buildings and widen the river from Adams street almost to VanBuren street, and that the same would cost in excess of $1,500,000, while the removal of the westerly half of the said bridge, including the abutment, would cost not to exceed $20,000. It is alleged that the waters of said south branch formerly flowed in a northerly direction into the main branch of the Chicago river; that since the main channel of the sanitary district has been opened said waters flow in a southerly direction into said channel; that if the property acquired by complainant, as aforesaid, is excavated prior to the removal of said west abutment, said waters striking said abutment will be diverted in an easterly direction, will create a cross-current immediately north of said bridge, and render navigation in said river at this point difficult and dangerous for vessels of large capacity.

It is further alleged that said abutment is constructed of solid concrete; that upon said concrete are massive iron pillars that support the superstructure of said bridge, and that said structure and abutment are permanent in character; that said railroad extends across and upon said bridge; that said defendants the Metropolitan West Side Elevated Railway Company and the Aurora, Elgin and Chicago Railroad Company have been and are guilty of numerous tres-

passes upon the said bridge and upon the property of the complainant by running electric and other cars over the same every day, and that a multiplicity of actions would be necessary to recover for such trespasses; that said property and west abutment are so situated that they interfere with the flow of the waters of the river and with vessels navigating said river and cause loss, delay and damage to the same, and unless said abutment is removed complainant will suffer great and continuous injury and damage; that in order to remove the part of said abutment and bridge situated upon said premises acquired by complainant, as aforesaid, it would be necessary to remove other parts of said abutment and bridge situated on other and different premises; that it is impossible to remove the part of said abutment situated upon the property of complainant without damaging other parts of the bridge and abutment and railroad owned by the said Metropolitan Railway Company, and if the complainant should perform such acts it would be guilty of trespass and liable in damages therefor. It is further alleged that the complainant has caused a written demand to be served upon said Metropolitan West Side Elevated Railway Company requesting said company to remove said abutment from said premises and to cease maintaining the same; that said company has failed and refused to comply with said demand and threatens to continue said abutment upon said premises for the purpose of acquiring an easement in said premises, and also threatens to annoy and vex complainant with criminal indictments and prosecutions if it shall remove or attempt to remove said abutment; that if the said Metropolitan Railway Company is permitted to continue its said abutment on said premises complainant will suffer great and irreparable injury therefrom and be prevented from exercising and enjoying the rights acquired by it, as aforesaid.

The prayer of the bill is that the court may enter a decree directing the Metropolitan West Side Elevated Rail-

way Company to immediately and forthwith remove said abutment from the premises hereinabove described, and that said company may be enjoined from continuing or maintaining said abutment upon said premises, and that all of said defendants be enjoined from using or appropriating said land, or any part thereof, in any manner which will conflict with the rights acquired by complainant as above set forth.

JOHN C. WILLIAMS, and WILLIAM BEEBE, for appellant.

W. W. GURLEY, A. L. GARDNER, H. M. CARTER, and HOPKINS, PEFFERS & HOPKINS, (FRANK J. LOESCH, of counsel,) for appellees.

Mr. CHIEF JUSTICE FARMER delivered the opinion of the court:

Appellees the Metropolitan West Side Elevated Railway Company and the Aurora, Elgin and Chicago Railroad Company have filed a motion to dismiss the appeal in this case. The reasons assigned in support of the motion are, that there is no question involved which gives this court jurisdiction and that the appeal should have been taken to the Appellate Court. If this were true it would not authorize a dismissal of the appeal but would require a transfer of the case to the Appellate Court. Appellant claims to be the owner in fee of land which is in the possession of the Metropolitan West Side Elevated Railway Company and in which it claims a perpetual easement. The bill seeks to deprive it of the right claimed. A freehold is therefore involved, and the appeal was properly brought to this court. *Espenscheid* v. *Bauer,* 235 Ill. 172; *Village of Riverside* v. *Watson,* 157 id. 669; *City of DeKalb* v. *Luney,* 193 id. 185.

While counsel for appellant have in their brief and argument discussed a wide range of questions and cited a

multitude of authorities, we are of opinion the decision in this case depends upon whether the city of Chicago was estopped from interfering with the Metropolitan company's right to maintain its bridge upon a portion of the land in question. The appellant concedes that it occupies the same legal position with reference to the property in question that the city of Chicago occupied before granting it to appellant, and that if the doctrine of estoppel could be applied against the city it may also be applied against appellant, its grantee.

It must be conceded for the purpose of this decision that the fee simple title to the land in dispute is, as claimed by appellant, in the sanitary district. Its title, the bill alleges, was acquired from the city of Chicago in October, 1903, and the city of Chicago acquired its title from the Pittsburg, Fort Wayne and Chicago Railway Company in December, 1885. The Metropolitan company claims an easement in a portion of the land granted by the city to appellant as a support for a part of its bridge across the Chicago river.

We do not think the condemnation proceeding referred to in the bill is of any importance in the decision of this case. The bill alleges that when the petition was filed the city of Chicago held title to the land but conveyed it to appellant before the trial for a consideration of $37,000, which was the amount paid for it by the city. The Metropolitan company was in possession of the land at the time and had been for several years, but was not made a party to the condemnation suit. Whatever rights it had it acquired from the city, and the grant to appellant was subject to those rights. After the grant from the city to the appellant a judgment was entered in the condemnation proceeding finding it was the owner of the land in dispute in this case, and said land was not taken into account in assessing damages in the condemnation suit. Appellant knew when it filed its petition for condemnation that the Metro-

politan company claimed some right in the land in dispute, for its bridge had been constructed and in use for eight years, and in 1898 appellant had, under an agreement with the Pennsylvania Railroad Company, constructed a by-pass on the west side of the land in dispute for the purpose of increasing the flow of water in the river, and in 1899 had entered into an agreement with the Metropolitan company by which appellant was to remove one hundred and four feet of the Metropolitan company's water tunnel which supplied it with water, and construct a new intake for said tunnel on the line of the west wall of the by-pass. The Metropolitan company not having been a party to the condemnation proceeding was not bound by the judgment in that case.

The bill alleges that the Metropolitan company never received any grant, license or permission from appellant or the city of Chicago to use the land in controversy, or any part thereof, upon which to construct or maintain any portion of its bridge. The ordinance adopted by the city council of the city of Chicago April 7, 1892, authorizing the Metropolitan West Side Elevated Railroad Company to construct, maintain and operate its railroad and branches, is made a part of the bill and its most material parts are set out in the statement preceding this opinion. The limits within which the railroad should be constructed are defined by the ordinance, and the company was authorized to construct its road across the south branch of the Chicago river by means of a bridge between Jackson street on the north and Congress street produced, on the south. A part of the land in controversy lies immediately south of Jackson street and extends about half way to VanBuren street, which is the next street south of Jackson. The Metropolitan company's bridge crosses the river practically midway between Jackson and VanBuren streets, and the bill alleges that said company excavated a large hole in the land in controversy and placed therein an abutment or foundation for its bridge.

The following plat will serve to show the shape and location of the land in controversy and the location of the bridge of the Metropolitan company:

Appellant contends that the city of Chicago acquired the land in dispute from the Pittsburg, Fort Wayne and Chicago Railway Company for a certain specified use and

purpose, namely, "straightening the south branch of the Chicago river between Adams street and VanBuren street;" that it held the land in trust for the public for that use and that it had no power or authority to devote it to any other use or purpose, and that if said city had attempted by an express grant to authorize the Metropolitan company to use a portion of the land for the support of its bridge its acts would have been void, and that therefore no estoppel can arise against the city or its grantee. The ordinance of April 7, 1892, under which the railroad and bridge were authorized to be constructed and maintained, contains no grant or permission to the Metropolitan company to use the land in dispute, but it does authorize said company to cross the Chicago river with its tracks "by means of a new bridge hereby authorized to be constructed by it upon such plans and in such manner as shall be approved by the commissioner of public works." The ordinance further provided that the said Metropolitan company's railroad and branches should be constructed under and subject to the inspection and supervision of the commissioner of public works and his assistants, and that the said road, branches and bridge might, within the limits defined, be constructed over, along, upon and across any lands which the company might acquire by lease, purchase, condemnation or otherwise. The bill alleges that the Metropolitan company took possession of a portion of the disputed premises whereon its bridge is partly constructed, on the first of June, 1894, and completed said bridge on or about May 1, 1895. The work of building the bridge was of such character and its location so public that it could not have been done without the knowledge of the city authorities. Besides, the ordinance required that it be constructed upon such plans and "in such manner" as the commissioner of public works should approve of. No objection appears to have been made by the city to the use of the land by the Metropolitan company for its bridge, and for eight years after its completion, and until

241—41

the city granted the land to appellant, in 1903, it raised no question as to the authority of the Metropolitan company to occupy the land and is not now questioning said company's right.   The city of Chicago was made a defendant to the bill in this case and filed its demurrer thereto.   The right of the Metropolitan company to use the land was first disputed by appellant when the bill in this case was filed, thirteen years after the completion of the bridge.   The city of Chicago might have prevented the use of any portion of said land by the Metropolitan company when the bridge was constructed, but with full knowledge of the facts, and with the approval of the commissioner of public works, which must be presumed, it permitted said company to locate a portion of its bridge on said land and expend a considerable sum of money in so doing.   It must be presumed, therefore, to have consented to said company's use of the said land.

There is no allegation in the bill as to the amount of money expended by the Metropolitan company in locating the abutment of its bridge on the disputed land, but the character of the structure and the uses made of it make it evident that the company was required to, and did, expend a substantial sum of money on appellant's land, and that to remove therefrom would cost another large sum.   The bill alleges that the cost of removal would not exceed $20,000. The question then arises whether the doctrine of equitable estoppel is applicable to the case.

Appellant contends that the same rules of law are applicable to this case that would be applicable if the land in controversy were part of the public street, and from this basis it is argued that the city of Chicago had no power either to expressly or by implication permit its occupation for other than public uses and purposes.   We think it open to serious question whether the city was without authority to grant the use of the land to a public service corporation for the uses and purposes to which it was put by said cor-

poration, but if, as contended by appellant, the city was without such authority in the first instance, it does not follow that having permitted the use of the property, neither the municipality nor the public will be estopped from revoking such permission and re-possessing the property.

There is a line of cases in this State holding that permitting a public street or highway, or part thereof, to be and remain in the possession of a private party is not sufficient to create an estoppel against the municipality causing such street or highway to be vacated and re-opened. The public rights in the streets cannot be lost by the mere act of abandonment by the public authorities. Appellant has cited a number of cases so holding, in its brief, among them *City of DeKalb* v. *Luney,* 193 Ill. 185. In that case the city of DeKalb was enjoined, at the instance of a property owner, from removing a fence enclosing said owner's residence from what the city claimed was a public street. The evidence showed that some three and one-third feet of the street was inside the enclosure of the property owner. There were no improvements on the portion of the street inside said enclosure except a fence, a lilac bush, a creeping vine and possibly a maple tree about ten years old. The injunction was made perpetual by the circuit court on the ground that the city, having permitted a portion of the street to be enclosed and possessed for more than twenty years by a private party, was estopped from reclaiming it. This court reversed that decree and held that under the circumstances shown by the evidence the doctrine of estoppel did not arise, but it was recognized in that case that there are circumstances under which a private party may invoke the doctrine of estoppel against a municipal corporation and the public. On page 190 it was said: "It must appear, to create an equitable estoppel against the public in cases such as that at bar, not only that the city authorities have long withheld the assertion of control over the portion of the street in question, and that private parties have been,

by the acts of those representing the public, induced, in good faith, to believe the street has been abandoned by the public, but also that on the faith of that belief and with the acquiescence of those representing the public such private party has erected structures on the street or made improvements thereon of such lasting and valuable character that to permit the public to assert the right to re-possess itself of the premises would entail such great pecuniary loss and sacrifice upon the private property holder that justice and right would demand that the public be estopped."

In *People* v. *City of Rock Island,* 215 Ill. 488, this court said (p. 495): "It has frequently been decided that the doctrine of estoppel *in pais* is applicable to municipal corporations, but that they will be estopped or not, as justice and right may require. There may be cases where, under all the circumstances, to assert a public right would be to encourage and promote a fraud. Where a party acting in good faith under affirmative acts of a city has made such expensive and permanent improvements that it would be highly inequitable and unjust to destroy the rights acquired, the doctrine of equitable estoppel will be applied. The hardships that would result from a contrary holding, and the necessity of raising an estoppel in particular cases to prevent fraud and injustice, have induced the establishment of the rule, and it has been several times said that there is neither danger to the public nor injustice in the application of the doctrine. In the exercise of proper diligence the public authorities may prevent encroachments upon public right, and if they do not, any citizen may take the necessary steps to do so, and if there is not only a failure to act by either, but affirmative action by the public authorities with the apparent approval of every one interested, under which the situation is changed and permanent improvements are made, the principles of equity require that the public should be estopped. The doctrine has been applied in *Chicago, Rock Island and Pacific Railroad Co.*

v. *City of Joliet,* 79 Ill. 25, *Chicago and Northwestern Railway Co.* v. *People ex rel.* 91 id. 251, *County of Piatt* v. *Goodell,* 97 id. 84, *Martel* v. *City of East St. Louis,* 94 id. 67, and *City of Chicago* v. *Union Stock Yards and Transit Co.* 164 id. 224." The same rule was again announced in *People* v. *Wieboldt,* 233 Ill. 572.

It is not required that there shall be some affirmative act of the city upon which to base an estoppel, but it may arise out of long acquiescence and such conduct and acts as amount to ratification. *City of Chicago* v. *Union Stock Yards and Transit Co.* 164 Ill. 224.

In our opinion, under the facts as set out in the bill, the case is one for the application of the doctrine of equitable estoppel and must be controlled by the authorities above cited. That question being conclusive of the case, it is unnecessary, to refer to other questions discussed by counsel in their brief and argument.

The demurrers to the bill were properly sustained by the circuit court, and its decree dismissing the bill is affirmed.

*Decree affirmed.*